# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JULIE BARRY,
Plaintiff

      v.

JO ANNE B. BARNHART,
Commissioner of Social Security,
Defendant.

:
:
:
:
:
:
:
:

CIVIL ACTION

NO. 05-1825

## Memorandum and Order

YOHN, J.                                                               September ___, 2006

       Plaintiff Julie Barry appeals the final decision of the Commissioner of Social Security

(the "Commissioner") denying her claim for disability insurance benefits (DIB) and supplemental

security income (SSI) under Titles II and XVI, respectively, of the Social Security Act (the

"Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  Barry and the Commissioner have filed cross

motions for summary judgment.  I referred the motions to a magistrate judge, who submitted a

report and recommendation that I grant the Commissioner's motion and deny the plaintiff's

motion, thus affirming the Commissioner's decision.  Barry has filed objections to the report and

recommendation.  The Commissioner did not file a response.  For the following reasons, I will

remand the case to the administrative law judge (ALJ) for reconsideration.

## I.      Factual Background

       Plaintiff is a thirty-nine-year-old woman with a twelfth grade education who has most

recently worked in retail at a greeting card shop.  (R. 136.)  She alleges that she became disabled

on October 17, 2002, due to various psychiatric ailments, including depression, anxiety, and bipolar disorder.  (R. 157.)

Barry has been receiving treatment for depression since 1994 (R. 324), and in 1996 was diagnosed with bipolar disorder (R. 326).

In a July 26, 2001 psychiatric progress note from Shore Health System, Barry was diagnosed with bipolar disorder and post-traumatic stress disorder.  (R. 353.)  However, the report stated that medication had stabilized Barry's condition for the past four years.  (R. 353.) The note further stated that Barry denied symptoms of bipolar disorder, was oriented, had an appropriate affect, had an organized thought process, and exhibited a congruent and euthymic mood.  (R. 353.)

However, on October 19, 2001, Barry was admitted to Shore Health System.  (R. 223.) She had written a note threatening to commit suicide and placed it in her husband's lunch bag. (R. 223.)  At the time she was drinking and using cocaine.  (R. 223.)  She reported that she was depressed at the prospect of filing for bankruptcy.  (R. 223.)  She was diagnosed with depression, cocaine abuse, and alcohol abuse.  (R. 224.)  Barry was discharged on October 22, 2001.  (R. 224.)

On October 30, 2001, Barry had a follow-up appointment at Delmarva Family Resources. (R. 245.)  At this appointment, she was diagnosed with a Global Assessment of Functioning score of 61.[1]  (R. 245.)

---

[1] The Global Assessment of Functioning test "measures an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness on a scale of one to a hundred."  *Colon v. Barnhart*, 424 F. Supp. 2d 805, 808 (E.D. Pa. 2006).  A score in the 61 to 70 range indicates some mild symptoms or some difficulty in social, occupational, or school functions, but an individual who is generally functioning pretty well.  *See*

In a November 27, 2001 physician treatment progress note from Delmarva, Barry's doctor reported that she was doing well; was alert/oriented; had a euthymic affect; and had fair attention/concentration, insight, and judgment.  (R. 251.)  In a February 12, 2002 physician treatment progress note, the doctor noted that Barry was doing very well, and that her concentration, insight, and judgment remained fair.  (R. 253.)  Similarly, in a July 11, 2002 physician treatment progress note, the doctor reported that Barry was alert; had a euthymic affect; and had fair judgment, concentration, and insight.  (R. 254.)  A September 23, 2002 physician treatment progress note reported similar observations, although at this point Barry was getting divorced and felt more depressed.  (R. 255.)  Still, she was handling those issues, retained a euthymic affect, and demonstrated fair skills as described above.  (R. 255.)

On January 7, 2002, a state agency medical consultant completed a residual functional capacity (RFC) assessment of Barry.  (R. 256-58.)  The assessment reported that Barry was not significantly limited in her ability to, *inter alia*, understand and remember very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and set realistic goals or make plans independently of others.  (R. 256-57.)  The assessment concluded that she was moderately limited in her ability to: understand and remember detailed instructions; carry out detailed instructions; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting.  (R. 256-

American Psychiatric Association, Diagnostic and Statistical Manual 34 (4th ed. 2000).

3

57.)  The assessment reported no marked limitations.

On December 12, 2002, in a psychiatric evaluation from Delmarva, Barry was assigned a 51-60 GAF score.[2]  (R. 316.)  The note reported that while she was irritable, she was also cooperative, had a full and appropriate affect, had a goal-directed thought process without loosening of associations or flight of ideas, was alert and oriented, has intact attention, and showed fair insight and judgment.  (R. 315-16.)

In a January 7, 2003 review, a state agency medical consultant determined that Barry had mild restrictions in performing activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and one or two episodes of decompensation.  (R. 260, 270.)

On October 6, 2003, The Family Practice & Counseling Network completed a psychosocial assessment of Barry.  (R. 293-94.)  The assessment reported that Barry was demonstrating symptoms of bipolar disorder, and assigned her a GAF score of 55.  (R. 293-94.)

On October 6, 2003, Barry also had her initial assessment with Shonda Nixon, Psy. D. (R. 368.)  In a progress note from that date, Dr. Nixon reported that Barry demonstrated a full range of affect and a congruent mood.  (R. 368.)  In an October 13, 2003 progress note, Dr. Nixon also reported that Barry had a full range of affect and was stable.  (R. 367.)  The note stated that her mood and affect remained consistent.  (R. 367.)  In an October 20, 2003 progress note, Dr. Nixon reported that Barry was cheerful, stable, and exhibited a full range of affect.  (R.

---

[2] A GAF score from 51-60 represents "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers).  *See* American Psychiatric Association, Diagnostic and Statistical Manual 34 (4th ed. 2000)

365.)  In a November 3, 2003 progress note, Dr. Nixon reported that Barry was feeling less depressed and in a happy mood.  (R. 363.)  Barry stated that she had recently started working part-time at a card store, and was excited about the opportunity.  (R. 363.)  She reported this news with a euthymic affect.  (R. 363.)  Further, in a November 17, 2003 progress note, Dr. Nixon stated that Barry was enjoying working, was in a somewhat consistent mood, and reported no significant mania, although she did feel depressed.  (R. 360.)  Finally, in a November 26, 2003 progress note, Dr. Nixon reported that Barry had a normal affect and consistent mood.  (R. 359.)  Barry stated that she was happy to have her job, but found it difficult to work for more than an hour without taking a break.  (R. 359.)

On November 23, 2003, Dr. Nixon completed a medical questionnaire concerning Barry. (R. 295-99.)  In this report, Dr. Nixon stated that Barry suffered from Bipolar II Disorder.  (R. 295.)  Dr. Nixon stated that Barry's depressive syndrome was characterized by anhedonia, appetite disturbance, decreased energy, feelings of guilt or worthlessness, and thoughts of suicide.  (R. 296.)  Dr. Nixon further stated that Barry's manic syndrome was characterized by hyperactivity, inflated self esteem, and easy distractibility.  (R. 296.)  Dr. Nixon reported that Barry suffered from marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence, or pace; and had suffered repeated episodes of decompensation, each of an extended duration.  (R. 297.)

## II.    Procedural Background

On November 14, 2002, Barry filed her application for DIB and SSI.  (R. 136-38.)  Both claims were denied (R. 107), and Barry filed a request for a hearing before an ALJ (R. 111).  Barry's administrative hearing occurred on November 25, 2003.  (R. 56.)

During Barry's administrative hearing, she testified about a variety of topics, including her work history.  She had previously worked as a real estate agent, bartender, and salesperson.  (R. 65.)  At the time of the hearing, she was working as a clerk at a greeting card shop, where she was responsible for serving customers and stocking shelves.  (R. 60, 64.)  She worked four or five hour shifts, about three times a week.  (R. 72.)  She stated that she had to take frequent breaks at work, sometimes one an hour.  (R. 72-73.)  When asked what triggered her need for those frequent breaks, Barry explained that customers would interrupt her while she was stocking cards, which would make her feel like she was never finishing her tasks; this was compounded by customers' attitude problems.  (R. 74.)  She emphasized that she could only work four or five hour days because she could not handle more human contact.  (R. 76.)  She testified that she did not have much trouble dealing with supervisors or coworkers, but had great difficulty interacting with customers.  (R. 97.)  She explained that overall, she was a good worker.  (R. 98.)

Barry stated that she last consumed alcohol on December 2, 2002, and last used cocaine a year and a half before the hearing.  (R. 65.)  She stated that she drives sometimes (R. 66); goes to AA meetings, the supermarket, and the gas station; talks to a friend on the phone at least an hour a day; and walks her dog (R. 67).

Barry also testified that she was feeling better with her medication.  (R. 66.)  She stated that while she still suffers from some episodes of panic, she feels less panicked on the medication, and reported that she has felt better "these last couple of years."  (R. 66.)  As an example of her improvement, Barry explained that she was not as panicked by the prospect of the administrative hearing as she would have been in the past.  (R. 66.)

Nonetheless, Barry stated that she sometimes had trouble getting out of bed.  (R. 79.)

She explained "I just thought that the whole day ahead of me was overwhelming and I just couldn't face interacting with all the people and trying to put on this face that everything was okay." (R. 79.)  When she was depressed, she would only eat something like a can of soup, call her friend, and bathe only if she had somewhere to go.  (R. 88.)  She also stated that her financial problems brought significant stress to her life.  (R. 83.)  Barry further testified that when she is manic, she gets crazed and obsesses over certain matters.  (R. 85.)

After hearing Barry's testimony, the ALJ asked a vocational expert (VE) whether work existed in the national economy for an individual of plaintiff's age, education, and part-time work history who "is capable of performing work that involves simple, repetitive, one to two step tasks, and a job that is low stress in nature providing no more than limited contact . . . with the public or coworkers." (R. 99.)  The VE responded that there are such jobs, including jobs as a surveillance system monitor, small product assembler, and in hand packing.  (R. 99-100.)  Barry's representative offered an alternate hypothetical, which the ALJ rephrased as whether "an individual so compromised by depression as to be unable to get out of bed on a regular basis and therefore unable to maintain regular attendance and during the course of the workday is unable to maintain regular concentration, persistence, or pace" would be able to work.  (R. 102.)  The VE stated that those limitations would significantly erode the job base.  (R. 102-03.)

On January 14, 2004, the ALJ issued her decision, denying Barry's application for benefits.  (R. 16-22.)  The ALJ first concluded that Barry had not engaged in substantial gainful activity since her onset date.  (R. 17.)  She next ruled that Barry had bipolar affective disorder, severe within the meaning of the regulations but not severe enough to meet or equal a listing.  (R. 19.)  The ALJ noted that Barry demonstrated an ability to perform activities of daily living, did

not present a marked impairment in her ability to interact with others, did not present evidence of impaired concentration or distractibility, and proffered evidence of only one episode of decompensation (the October 2001 hospitalization).  (R. 19.)  The ALJ then concluded that Barry retained the residual functional capacity to perform simple, low stress 1-2 step tasks, involving limited contact with the public and coworkers.  (R. 20.)  The ALJ ruled that Barry was not able to perform any of her past relevant jobs.  (R. 20.)  However, based on the testimony of the VE, the ALJ ruled that Barry was able to perform various jobs, and accordingly, was not disabled under the Act.  (R. 21.)

In making these rulings, the ALJ accepted Barry's testimony as generally credible (R. 20); however, she only gave Dr. Nixon's medical questionnaire partial probative weight (R. 18).  The ALJ found that the some of the questionnaire responses were not supported by various sets of progress notes, including those of Dr. Nixon herself.  (R. 18.)  The ALJ accepted Dr. Nixon's conclusion that Barry would be easily overwhelmed when subjected to medium or high levels of stress, but not the determination that Barry was totally precluded from performing substantial gainful activity.  (R. 19.)  The ALJ also noted that while Barry reported difficulties working at her job at the card shop, that job was more stressful and difficult than the jobs prescribed by the VE.  (R. 20.)

On February 18, 2005, the Appeals Council denied Barry's request for review.  (R. 7.)  Accordingly, the ALJ's decision is the final decision of the Commissioner.  (R. 7.)

On July 14, 2005, Barry brought an action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the ALJ's decision.  The case was assigned to a magistrate judge.  Both parties filed motions for summary judgment, and the magistrate judge issued a

report and recommendation recommending that Barry's motion for summary judgment be denied and the Commissioner's motion for summary judgment be granted.

## III.    Standards of Review

I review *de novo* the parts of the magistrate judge's report to which Barry objects.  28 U.S.C. § 636(b)(1)(C).  I may accept, reject, or modify, in whole or in part, the magistrate's findings or recommendations.  *Id.*

In contrast, a district court may not review the Commissioner's decision *de novo*.  The court may only review the Commissioner's final decision to determine "whether that decision is supported by substantial evidence."  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).  "[S]ubstantial evidence is more than a mere scintilla." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotation omitted).  "Substantial evidence 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Hartranft*, 181 F.3d at 360 (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)).  In making this determination, the court must consider "the evidentiary record as a whole, not just the evidence that is consistent with the agency's finding."  *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).  The substantial evidence test is "deferential."  *Id.*  Consequently, the court "will not set the Commissioner's decision aside if it is supported by substantial evidence, even if [it] would have decided the factual inquiry differently."  *Hartranft*, 181 F.3d at 360.

## IV.    Discussion

### A.    Introduction

To qualify for DIB or SSI payments, a claimant must be unable "to engage in any

9

substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3).  When evaluating a claim for disability payments, the Commissioner applies a five-step sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000).  The Commissioner considers: (1) whether the claimant worked during the alleged period of disability; (2) whether the claimant has a "severe medically determinable . . . impairment"; (3) whether the "impairment" meets the requirements of a listed impairment; (4) whether the claimant can continue to perform "past relevant work"; and (5) whether the claimant can perform "other work" in the national economy.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proving steps one through four.[3]  If the claimant satisfies these requirements, the burden shifts to the Commissioner to show that the claimant is capable of performing "other work."  *Sykes*, 228 F.3d at 263.

Further, there is an additional process the Commissioner must employ to evaluate an alleged mental impairment.  *See Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999); 20 C.F.R. §§ 404.1520a, 416.920a.  This technique requires the Commissioner to first consider the claimant's symptoms, signs, and laboratory findings to determine whether the claimant has a mental impairment.  §§ 404.1520a(b)(1), 416.920a(b)(1).  If the Commissioner finds an impairment, the Commissioner must then rate the degree of the functional limitation caused by the impairment in four areas: activities of daily living; social functioning; concentration,

_____

[3] Technically, neither party bears the burden of proving step three "[b]ecause step three involves a conclusive presumption based on the listings."  *Sykes v. Apfel*, 228 F.3d at 263 n.2.

persistence, or pace; and episodes of decompensation.  §§ 404.1520a(b)(2), 404.1520a(c)(3), 416.920a(b)(2), 416.920a(c)(3).  Based on this evaluation, the Commissioner must determine if the impairment is severe, §§ 404.1520a(d), 416.920a(d); if it is severe, the Commissioner must then determine whether it meets or equals a listing, §§ 404.1520a(d)(2), 416.920a(d)(2).  If the impairment does not meet or equal a listing, the Commissioner will then conduct a residual functional capacity assessment.  §§ 404.1520a(d)(3), 416.920a(d)(3).

Here, Barry has filed two objections to the magistrate judge's recommendation.  First, she contends that the magistrate judge mistakenly approved the ALJ's decision to accord Dr. Nixon's opinion only partial weight.  Second, Barry argues that the magistrate judge erred in concluding that the ALJ's hypothetical question to the VE accurately conveyed her limitations.  On these two points, she argues that the ALJ's reasoning is not supported by substantial evidence.

### B.  The ALJ's Decision to Accord Dr. Nixon's Questionnaire Partial Weight

Barry first argues that the ALJ's decision to accord only partial probative weight to Dr. Nixon's questionnaire responses is not supported by substantial evidence.  As described below, the court will reject this argument.

It is well established that "[t]reating physicians' reports should be accorded great weight, especially 'when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged period of time.'"  *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987)).  The regulations provide that treating physician opinions will be granted controlling weight where they are well-supported by medical evidence and not inconsistent with other substantial evidence in the record.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  "In choosing to reject the treating

11

physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (internal quotation marks omitted).

Here, Dr. Nixon's questionnaire responses stated that Barry met the listing for Affective Disorders, as listed at 20 C.F.R. Pt. 404, Subpt. P, Appx. 1 § 12.04. Thus, had the ALJ fully credited Dr. Nixon's questionnaire, Barry would have been found disabled under the Act at step 3 of the five-step test.

However, substantial evidence supports the ALJ's decision to accord Dr. Nixon's questionnaire only partial probative weight. The ALJ correctly noted that the dire limitations described in the questionnaire are not supported by the rest of the medical evidence in the record. First of all, the extreme symptoms that Dr. Nixon reported in her questionnaire are never mentioned in her treatment notes; rather, those notes invariably describe Barry as exhibiting a full range of affect and a stable mood. Also, as stated by the ALJ, the treatment notes from Shore Health System state that Barry was stable with medication, and show that she was only hospitalized once when she used drugs and alcohol. The ALJ also appropriately noted that Dr. Nixon's office assigned Barry a GAF score of 55, which generally stands for moderate, rather than severe,[4] limitations. Additionally, Dr. Nixon's questionnaire responses are inconsistent with the two state agency assessments in the record, which described only mild and moderate – not

---

[4] A GAF score from 41-50 represents "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *See* American Psychiatric Association, Diagnostic and Statistical Manual 34 (4th ed. 2000)

marked – limitations.  Finally, the questionnaire reported limitations of a more serious nature than the physician treatment notes from Delmarva Family Resources.

The limitations described by Dr. Nixon are also inconsistent with Barry's testimony. Barry testified that she was able to prepare her own food, drive a car, travel to appointments unaccompanied, travel to and socialize at the supermarket, talk to a friend on the phone for at least an hour a day, and walk her dog.  She also testified that with her medication she had been feeling better for the last couple years and, as an example, stated that she was not as anxious about going to the administrative hearing as she would have been in the past.  Finally, Barry was working at the time of her administrative hearing, and had not missed any shifts.  While her work situation was stressful to her, her complaints about the work were almost entirely limited to problems dealing with customers, which is not an essential component of every job.  All of this evidence conflicts with Dr. Nixon's questionnaire responses, and accordingly, the ALJ's decision to accord that opinion only partial weight is supported by substantial evidence.

Barry also argues that the ALJ's use of treatment notes, including those completed by Dr. Nixon, represents a lay opinion, as proscribed by *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).  *See id.* ("In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion.").  However, the court will also reject this argument.  The regulations require mental ailments to be demonstrated by medical evidence, which consists of signs, symptoms, and laboratory findings.  20 C.F.R. §§ 404.1508, 416.908.  Further, in addressing the severity of a mental impairment, the regulations instruct the Commissioner to

13

"consider all relevant and available clinical signs and laboratory findings."  §§ 404.1520a(c)(1),

416.920a(c)(1).  The regulations explain that "[p]sychiatric signs are medically demonstrable

phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior,

mood, thought, memory, orientation, development, or perception."  20 C.F.R. §§ 404.1528(b),

416.928(b).  Here, Dr. Nixon's observations about Barry's affect, mood, and stability constitute

signs.  *See Rivera v. Barnhart*, No Civ. A. 04-2102, 2005 WL 713347, at *8 (E.D. Pa. March 24,

2005).  Further, the Third Circuit has consistently stated that in order to be controlling, the

opinions of treating physicians must be supported by the medical evidence of the record, which

concept includes treatment notes.  Indeed, in *Plummer v. Apfel*, 186 F.3d 422, 430 (3d Cir. 1999),

the Third Circuit accorded limited weight to a treating physician's answers to interrogatories

when the answers conflicted with prior notes.  This demonstrates that the Third Circuit allows

ALJs to compare a treating physician's opinion with that physician's prior records.

Barry is correct that *Morales* counsels against overvaluing treatment notes because they

report a claimant's psychiatric state while at a clinic, not work.  *Morales*, 225 F.3d at 319.

However, in this case the ALJ's decision is supported not only by the treatment notes from Dr.

Nixon, her treating psychologist, but also two state agency assessments, mental status reports

from Shore Health System and Delmarva, and Barry's testimony.  *See Torres v. Barnhart*, 139

Fed. Appx. 411, at *3 (3d Cir. 2005).  Further, in this case the ALJ weighed the medical evidence

much more objectively than the ALJ did in *Morales*.  In *Morales*, the ALJ rejected a great deal of

medical evidence simply because he did not believe the claimant's testimony at the hearing and

because there was evidence that the claimant malingered during medical testing.  *Id.* at 318.

Here, however, the ALJ did not inappropriately base her rejection of the treating psychologist's

14

questionnaire opinion on credibility judgments, speculation, or lay opinion. Thus, the court finds

that substantial evidence supports the ALJ's decision to accord Dr. Nixon's questionnaire only

partial probative weight.

### C.     The Adequacy of the ALJ's Hypothetical Question

Barry next challenges the ALJ's determination at step five that she remained able to

perform substantial gainful activity. The ALJ's conclusion "was based in large measure on the

testimony provided by the vocational expert." *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d

Cir. 2005). Barry claims that the hypothetical question to the VE did not refer to several of her

limitations – her difficulties with concentration, distractibility, persistence, and pace; her periodic

isolation; and her depressed mood – and accordingly, cannot justify the ALJ's step-five ruling.

The Third Circuit has explained that "'the vocational expert's testimony concerning a

claimant's ability to perform alternative employment may only be considered for purposes of

determining disability if the question accurately portrays the claimant's individual physical and

mental impairments.'" *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002) (quoting

*Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984). The hypothetical question "must

reflect *all* of a claimant's impairments." *Id.* Thus, "the ALJ must accurately convey to the

vocational expert all of a claimant's *credibly established limitations*." *Rutherford*, 399 F.3d at

554.

There are two main methods by which a claimant may challenge an ALJ's hypothetical

question: (1) by arguing that the hypothetical question failed to include limitations that the ALJ

identified in the RFC assessment, or (2) by arguing that the ALJ "failed to recognize credibly

established limitations during the RFC assessment and so did not convey those limitations to the

vocational expert." *Id.* at 554 n.8.  At bottom, arguments of the second sort challenge the RFC assessment itself.  *Id.*

In this case, the ALJ's RFC assessment concluded that Barry retained the RFC to "perform simple, low stress 1-2 step tasks, involving limited contact with the public and co-workers."  (R. 20.)  In other parts of the opinion she noted that when Barry "is diligent in taking her medications, her symptoms are resolved or lessen" (R. 20); that Barry did not present marked limitations in performing activities of daily living (R. 19); that she did not present evidence of social withdrawal or isolation (R. 19); and that there was no evidence of impaired concentration, distractibility, or attention problems (R. 19).  Accordingly, because the ALJ did not recognize the limitations that Barry claims she should have included in the hypothetical question to the VE, the court interprets her argument as being an attack on the RFC assessment.  Thus, the court must determine whether Barry credibly established the limitations that she now alleges.  *See Rutherford*, 399 F.3d at 554.

In *Rutherford*, the Third Circuit described the standard for determining when a limitation has been credibly established (and thus must be included in the hypothetical).  First, "[l]imitations that are medically supported and otherwise uncontroverted in the record" have been credibly established.  *Id.*  Second, limitations that are medically supported in some parts of the record but contradicted in other parts of the record may or may not be credibly established; it is for the ALJ to decide which evidence to credit, but he or she "cannot reject evidence for no reason or for the wrong reason."  *Id.* (internal quotation marks omitted).  "Finally, limitations that are asserted by the claimant but that lack objective medical support may possibly be considered nonetheless credible"; however, the ALJ may reject a claimed limitation when it is contradicted

by the objective evidence in the record.  *Id.*

As noted above, Barry argues that she credibly established limitations concerning her concentration, persistence, and pace; isolation; and depression.  Regarding her first contention, the ALJ stated that "[t]here is no evidence of impaired concentration.  Treatment notes do not show evidence of distractibility or attention problems when the claimant is diligent in following prescribed treatment." (R. 19.)  Accordingly, the ALJ did not include any reference to limitations in concentration, persistence, or pace in the hypothetical question that she submitted to the VE.  However, the record contains frequent references to such a limitation.  First of all, Dr. Nixon's questionnaire states that Barry suffers from marked difficulties in maintaining concentration, persistence, or pace.  (R. 297.)  While Dr. Nixon's statement that Barry met a listing was inconsistent with the record as a whole, her finding that Barry was limited in this area is supported by other parts of the record.  The state agency's residual functional capacity assessment concluded that Barry was moderately limited in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (R. 257.)  Further, the subsequent state agency assessment reported that Barry suffered from a moderate limitation in maintaining concentration, persistence, or pace.  (R. 270.)  These reports are also consistent with Barry's testimony, which the ALJ found generally credible (R. 20), in which she complained of having to take breaks from her job every hour and stated that when manic, she had difficulty concentrating because she would think about "20 different things at once" (R. 86).

There may be a valid explanation for the ALJ's omitting this limitation from the

hypothetical.  For example, Barry did attribute her need for breaks largely to being upset by customer interaction, which the ALJ may have found was the only cause for these difficulties. However, this is not clear from the record.  The ALJ plainly stated that there was no evidence of these limitations, not that the limitations could be controlled by separating Barry from customers. Thus, the record as a whole demonstrates that Barry suffered from at least moderate limitations in maintaining concentration, persistence, or pace, and that limitation should have been included in the hypothetical question.

The Third Circuit illustrated this point in *Ramirez*.  In *Ramirez*, the court ruled that when an ALJ concluded that a claimant often suffered from limitations in concentration, persistence, or pace, but failed to include that limitation in the hypothetical question to the VE, the hypothetical question did not accurately convey all of the claimant's limitations.  372 F.3d at 552.  While the limitation in *Ramirez* "often" occurred and here is arguably of "moderate" severity, these two terms are essentially synonymous.  The five point scale for measuring limitations in concentration, persistence, and pace formerly was broken into categories labeled never, seldom, often, frequent, and constant.  *Id.* at 551.  The categories have been revised, however, and the five levels are now labeled none, mild, moderate, marked, and severe.  *Colon v. Barnhart*, 424 F. Supp. 2d 805, 811 (E.D. Pa. 2006).  "Often" and "moderate" both occupy the middle category, and thus, "[a] finding of 'often' under the old scale therefore roughly equates to a 'moderate' deficiency."  *Id.*  Based on these considerations, the court concludes that the ALJ's hypothetical question did not adequately convey all of Barry's limitations because it did not consider her limitations in maintaining concentration, persistence, or pace.  This could well impact on her ability to maintain more than the part-time employment she held at the time of the hearing or her

need for hourly breaks, which might also affect the VE's opinion.

Barry also argues that the hypothetical question was deficient for failing to include reference to her periodic isolation. Here, however, the ALJ is on firmer ground. While Dr. Nixon's questionnaire reported that Barry suffered from marked difficulties in maintaining social functioning (R. 297), this finding is not supported by the rest of the record. The state agency's RFC assessment reported that Barry was not significantly limited in her ability to interact appropriately with the general public, or in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (R. 257.) The second state agency assessment found that Barry suffered from only mild limitations in maintaining social functioning. (R. 270.) Further, Barry testified to talking to her friend on the phone daily for an hour, getting along with coworkers and supervisors, socializing at the grocery store, and interacting with her physicians. Barry testified that even when she is depressed she will still talk to her friend and at times even go over to her house for dinner. Thus, the ALJ appropriately did not include this alleged limitation in her hypothetical question to the VE.

Similarly, the ALJ's decision that Barry's depression did not limit her functional ability is also supported by substantial evidence. The ALJ correctly referred to Barry's entire span of medical history, and noted that records from Shore Health System in July 2001 stated that Barry had been stable for four years. Barry was hospitalized in October 2001, but that occurred when she was using drugs and drinking, which she no longer does. Upon release and through 2002, records from Delmarva Family Resources consistently reported that Barry was doing well, was alert/oriented, and had a euthymic affect. Even the September 23, 2002 physician treatment progress note, in which Barry reported that she was getting divorced and felt more depressed,

stated that Barry was handling those issues and retained a euthymic affect.  (R. 255.)  Further, throughout the treatment notes from Dr. Nixon, Barry is described as demonstrating a full range of affect, a consistent mood, and reported that she was happy to be working.  Barry also testified that when she is depressed she will sometimes stay in bed all day; however, she stated that this was because she had a hard time finding a reason to get out of bed when she was not working, which cannot be interpreted to limit her ability to work.  (R. 80.)  Also, she testified that even when she is depressed she will talk to her friend, eat, bathe, and go to work or AA meetings.  (R. 88.)  She also testified that she will go to dinner with her friend while depressed.  (R. 88.) Finally, she reported to feeling better during the past eighteen months.  Accordingly, the ALJ's determination that Barry's bipolar disorder only limited her ability to perform high stress jobs is supported by substantial evidence.

Thus, the court concludes that the ALJ's hypothetical question to the VE did not accurately convey Barry's limitations in concentration, persistence, or pace.  Accordingly, the Commissioner's decision is not supported by substantial evidence.  The court will thus remand the case to the ALJ for further proceedings consistent with this opinion.  *See Burns v. Barnhart*, 312 F.3d 113, 124 (3d Cir. 2002).

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JULIE BARRY,                                    :
Plaintiff,                                      :          CIVIL ACTION
                                                :
        v.                                      :          NO. 05-1825
                                                :
JO ANNE B. BARNHART,                            :
Commissioner of Social Security,                :
Defendant.                                      :


# Order

AND NOW, this _____day of September 2006, upon consideration of the parties' cross-motions for summary judgment (Doc. Nos. 7, 8), and after careful and independent review of the magistrate judge's report and recommendation and the plaintiff's objections thereto, it is hereby ORDERED that:

1. Plaintiff's objections are GRANTED to the extent that I am remanding.

2. The Report and Recommendation of United States Magistrate Judge David R. Strawbridge is APPROVED except to the extent that I am remanding.

3. The plaintiff's motion for summary judgment is GRANTED to the extent that I am remanding.

4. The motion of defendant Jo Anne Barnhart, Commissioner of Social Security, for summary judgment is DENIED.

5. The matter is REMANDED to the ALJ for further proceedings consistent with this

memorandum and order.

 s/ William H. Yohn Jr., Judge 
William H. Yohn Jr., Judge